## Brinley & al. vs. Spring.

It is not against the policy or rules of the law, that an insolvent debtor should assign all his property to secure a part of his creditors :—

Nor that the assignment should be by way of mortgage, with a stipulation that the mortgagor should retain possession of the property, changing that which is personal by manufacturing and selling; and that such possession should continue for a length of time beyond the day when the money becomes due ;—provided such possession is not inconsistent with the security of the mortgagee ; and there be not mingled in the contract any intention to delay or defraud other creditors, or to withhold the property from them beyond what may be necessary for the mortgagee's protection.

The length of time for which such possession is to continue, may be so great as to afford evidence, *per se*, of fraudulent intent.

It is not essential to the validity of a mortgage of personal property, that it should contain a schedule or particular enumeration and valuation of the goods ; if it be made without fraud, and sufficiently indicate the goods intended to be mortgaged.

The delivery of the deed of transfer of a ship at sea, passes the title to the vendee, subject only to be defeated by his negligence in not taking possession of her within a reasonable time after her return to port.

The negligence in that case must be such as to afford ground for the presumption of fraud.

Should such vessel arrive at another port, notice of the sale, forwarded by the purchaser to the captain, would seem to be equivalent to taking possession.

THIS was an action of trespass, against the sheriff, for taking and carrying away the plaintiffs' schooner *Factor*, on the 6th day of *May* 1830 ; which the defendant justified under divers writs of attachment in actions of *assumpsit*, against the *Saco Manufacturing Company*, served by *Albra Wadleigh*, one of his deputies.

In a case stated by the parties it was agreed that the schooner was built in 1827, by *Robert Rogers*, who was general agent for the *Saco Manufacturing Company*, and for its use, with the funds of the company in his hands. The accounts of the building and employment of the vessel were kept on the company's books, in the same manner as its other transactions, including her repairs and earnings, which latter were always received by the company. On

31

the 20th day of *June*, 1827, when she was completed and ready for use, *Rogers* gave to the company a written memorandum, stating that in consideration, that the company had agreed to permit him to take to his own use the schooner built with its funds, he promised to pay the company therefor the amount of all bills and expenditures upon her, or to account for her earnings and convey her as the company should direct, on demand. She was accordingly enrolled at the custom house, *June* 29, 1827, and furnished with regular documents as the property of *Rogers.*

On the 16th day of *December*, 1829, the company, being largely indebted to sundry banks and individuals, made an assignment and conveyance, in general terms, of all its effects and property whatsoever, to the plaintiffs, by an indenture to which certain banks, being the principal creditors of the company, were parties of the third part, upon the following trust :—" That until default of or in the payment of the principal or interest " of the debts due to the specified creditors, " the trustees shall permit the said company to use, occupy and enjoy all the estate, real and personal, hereby conveyed and transferred to them, and to take the rents and profits thereof, and to sell, dispose of, and apply to its own use at its discretion, all the said personal estate, except the machinery, (no part whereof shall be sold or disposed of by the said company without the consent of the trustees,) without molestation or hindrance, but only according to the usual course of the business of cotton and iron manufacture ; unless the trustees shall be of opinion that the safety of the claims of the said parties of the third part requires them to enter upon and take actual possession of the said granted premises ; in which case " they " shall have the right, and it shall be their duty to take into their possession all the said estate, real and personal, and all personal estate which may hereafter be acquired or purchased by said company, and to make sale and dispose of the same in such way and manner as they shall be directed by said parties of the third part ;" &c. " and they shall also collect all the debts and *choses in action*, and shall pay over and distribute the proceeds," &c. to the creditors ; accounting for the surplus, if any, to the company. In the same indenture it was further provided that the trustees should have free

access to the company's books, papers and manufactories, and receive a full account and report from time to time of its proceedings; and that any neglect, obstruction or refusal herein, by the company or its officers should be a sufficient cause and justification to the trustees to sequester the property. It was further agreed that the creditors might use their own discretion respecting the collection of such of the assigned notes as were given to the company for shares in its capital stock, or for debts originally due to the corporation; and might also enforce payment against the indorsers or guarantors of the company's notes held by said creditors, unless such indorsers or guarantors who were to become parties of the fourth part, should thereby consent to continue responsible as before, till the trustees should have made a final disposition of the property, but not exceeding the term of five years. It was also agreed that when the trustees should deem it necessary to take actual possession of the property assigned, they should also have the right to take possession of all the notes, books, accounts, and all other property which the company might have acquired subsequent to the assignment, and apply the proceeds thereof to the purposes of the assignment, first paying the debts created in the purchase or manufacture of the same. And the company stipulated to complete the machinery then in progress, and to keep the factories insured against fire, in such amount as the trustees should direct. But the indenture was upon condition that if the debts due to the creditors, parties of the third part, should be paid by the company in five years, the conveyance should become void, &c. This assignment was duly recorded in the county registry.

On the 24th day of *February*, 1830, the trustees, under this conveyance, entered and took possession of the property described therein, situated in *Boston* and *Saco;* the factories having on the 21st of *February* been consumed by fire. And on the 25th day of the same month, *Rogers*, by a bill of sale of that date, conveyed the vessel to the plaintiffs; in whose name she was regularly enrolled at the custom house, *May* 8, 1830.

At the date of the indenture, the vessel was at sea, out of the limits of the United States, under the command of one *Hill;* who

arrived with her at *New York*, being her first American port, in *March* or *April* following.    On the 24th day of *April*, as soon as intelligence of her arrival reached *Saco*, a letter was ·sent to the master by *Rogers*, informing him of the assignment, and directing him to deliver over to the trustees any property belonging to the company, in his hands.    At the same time a letter with the same intelligence was addressed to him by *Jonathan King*, one of the trustees, acting at *Saco* for the others, directing him, for any further advice in regard to his future proceedings, to confer with the trustees at *Boston ;* some of whom might succeed in getting a freight for that city.    The captain, however, having sailed under general discretionary orders for the employment of the vessel in freighting business, and being unable to obtain a freight for *Boston*, did not communicate with the trustees there, but sailed directly for *Saco ;* at which place she arrived in the evening of *May* 5, 1830.    Early the next morning the captain met Mr. *King*, who stated to him that the vessel had been conveyed to the trustees, naming them, in whose behalf he acted ; directing him where to moor the vessel ; and inquiring if he would take a frieght to *New York.*    The captain went on board her again, and returned on shore ; after which, about ten o'clock in the forenoon, she was attached.    Soon after the attachment, she was removed by the captain to the place directed by Mr. *King ;* who, about half an hour after the attachment, came on board, and asserted the title of the plaintiffs, saying she had been conveyed to them on the 24th day of *February.*    Upon the change of her papers three days afterwards, *King*, *Rogers* and *Hill* went on board, for the purpose of committing her to *Rogers* as master.    Some of the debts, for which she was attached, accrued prior to the conveyance on the 16th day of *December*, 1829.

   *J. & E. Shepley*, for the plaintiffs, maintained the following positions.

   1. The legal title to the vessel was in *Rogers*, and was conveyed by him to the plaintiffs ; notwithstanding any equitable claims of the corporation.    For the legal title to a registered ship may well exist in one person, and the equitable in another.    *Weston v. Penniman*, 1 *Mason*, 306 ; 2 *Bl. Com.* 337 ; 2 *Fonbl. Eq.* 147.

Brinley v. Spring.

And the assent of the corporation, in the present case, may be presumed in law, without a corporate vote. *Prop'rs of Canal bridge v. Gordon,* 1 *Pick.* 297 ; *United States bank v. Dadridge,* 12 *Wheat.* 68 ; *Lincoln & Ken. bank v. Richardson,* 1 *Greenl.* 81 ; *Fryeburg canal v. Frye,* 5 *Greenl.* 42 ; *Kupfer v. S. Parish Augusta,* 12 *Mass.* 185. Even its subsequent assent is binding. *Episc. Char. Soc. v. Episc. Ch. in Dedham,* 1 *Pick.* 372 ; *Emerson v. Prov. Hat Manuf. Co.* 12 *Mass.* 237. It is questionable whether the legal title to a vessel at sea can be changed, without written evidence of the transfer. *The Sisters,* 5 *Rob.* 155 ; *San Jose Indiana,* 2 *Gal.* 284 ; *Weston v. Penniman,* 1 *Mason,* 317 ; *Ohl v. Eagle Ins. Co.* 4 *Mason,* 172. If therefore the legal title was in *Rogers,* it is wholly immaterial whether the plaintiffs took possession of the vessel before the attachment, or not.

2. But if the vessel belonged in law to the company, she was conveyed to the plaintiffs by the indenture of *Dec.* 16, 1829 ; the language of that instrument being sufficiently broad for this purpose. Where a ship at sea is conveyed in mortgage, it is not necessary that the deed should recite her registry ; *D'Wolf v. Harris,* 4 *Mason,* 533 ; and no new registry need be entered at the custom house, till after her return. *United States v. Willing,* 4 *Cranch,* 48. Nor is it a good objection that by that conveyance the mortgagors were to retain possession of the mortgaged property, and did in fact retain it. *Brooks v. Marbury,* 11 *Wheat.* 78 ; *Reed v. Jewett,* 5 *Greenl.* 96 ; *Holbrook v. Baker, ib.* 309 ; *Haskell v. Greely,* 3 *Greenl.* 425. Nor, that it was made to secure future advances. *Ward v. Sumner,* 5 *Pick.* 59 ; *Holbrook v. Baker, supra.* The instrument, moreover, was good as an assignment for collateral security, vesting the title in the assignees, notwithstanding the stipulation that the assignees should not take possession except on a contingency, and that the company might sell the property, or substitute other property in its stead. *Conard v. Atlantic Ins. Co.* 1 *Pet.* 386 ; 4 *Mason,* 533 ; *Haille v. Smith,* 1 *B. & P.* 563.

3. The title of the plaintiffs was not defeated or impaired by any neglect in taking possession. For possession, to all legal purposes, was taken in *New York,* by notice of their title to the master, to

which he submitted. It was again taken in *Saco*, before the attachment, by directions given to the master, with which he afterwards complied. But no such act was necessary; for the sale of a ship at sea is good on the delivery of the deed of conveyance, unless defeated by unreasonable neglect to take possession, after her return into port in the State to which she belongs. *Atkinson v. Maling*, 2 *D. & E.* 462; *Bissell v. Hopkins*, 3 *Cowen*, 166; *Putnam v. Dutch*, 8 *Mass.* 287; *Badlam v. Tucker*, 1 *Pick.* 389; *Gardiner v. Howland & tr.* 3 *Pick.* 602; *Wheeler v. Sumner*, 4 *Mason*, 183; *D'Wolf v. Harris, ib.* 533; *Bholan v. Cleaveland*, 5 *Mason*, 174; *Conard v. Atlantic Ins. Co.* 1 *Pet.* 449; *Dowes v. Cope*, 4 *Bin.* 258.

*Mason*, for the defendant, in the first place examined the question whether the plaintiffs were entitled to hold the vessel by the indenture of *Dec.* 16, 1829. And he contended that the conveyance was inconsistent in its nature, and *felo de se.* It is a grant of rights over property, with provision that the grantor shall still retain the absolute right for all purposes useful to himself; a provision inconsistent with a sale, mortgage, or pawning; and creating a confusion of rights which the law cannot permit. It is in effect a barrier interposed between the company and the arm of the law; a writ of protection, covering their whole property; leaving the company at liberty, for five years, to manage its vast capital, and to pay what debts it pleases; but effectually shielding it from all legal coercion.

But it is of the very essence of a sale or mortgage, that the vendee or mortgagee has a vested right not dependent on the will or act of the vendor or mortgagor. If the company retains the ownership for all its own purposes, it is owner for the purposes of its creditors.

No imaginable case can operate more severely than the present on the general creditors; all the property of the company being assigned, without provision, in any event, for the excluded creditors. The surplus is to go only to the company. The trustees may pay after contracted debts, out of after acquired property; but existing debts are not to be paid out of any property whatever.

The assignment being of all the property of the company, is a

Brinley *v.* Spring.

sufficient indication of its insolvency. And this being its situation, the attempt to continue its operations five years longer, to try its fortune in business at the risk of its present and future creditors, is an experiment not to be countenanced by the law.

As a sale, the conveyance is clearly fraudulent and void, for want of nearly all the requisites of such a contract; there being no inventory or estimate of the property; the transaction being secret; and not accompanied by possession.

Nor can it be supported as a mortgage. It seems to be admitted, by all the authorities, that there can be no valid pawn without possession. In the most ancient case on this subject, *Ryal v. Rolle,* 1 *Atk.* 164, such mortgage, without possession, was held equally fraudulent and void, as in case of an absolute sale; because equally dangerous to the public, and injurious to the rights of private creditors. *Worseley v. Demattos,* 1 *Burr.* 467. The true rule is stated in *Sturdivant v. Ballard,* 9 *Johns.* 337, as applicable both to mortgages and sales; that any agreement, in the deed or otherwise, that the vendor shall retain possession, makes the conveyance fraudulent and void; unless special reasons, consistent with the policy of the law, be shown, and approved by the court. *Cadogan v. Kennett, Cowp.* 432; *Estwick v. Caillaud,* 5 *D. & E.* 420; *Machie v. Cairns,* 5 *Cowen,* 547; 2 *Kent's Com.* 405—413. If the fact of the conveyance being a mortgage, lays a foundation for excusing the want of some of the requisites of an absolute sale; yet it cannot be a safe general rule that possession need not attend a mortgage of personal property. No rule could be laid down, better adapted to protect fraudulent conveyances. If a merchant's stock can be secured from the reach of legal process solely by being mortgaged for a *bona fide* debt, no fraudulent absolute conveyance need ever be made.

Without possession, these requisites must attend a valid mortgage of personal property. The property must be of a nature to continue till condition broken, or during the term of credit, without material deterioration. It must not be of perishable property; for otherwise, it would be no valuable security to the creditor, and only a protection against the process of law. It must also be made as pub-

lic and notorious as the case will admit. The mortgagor must re-
tain no right to sell or dispose of it ; for this would necessarily de-
stroy the existence of any security to the creditor. An exact in-
ventory or description should be made, to show in certainty what
property is conveyed. And the time allowed for the mortgagor to
retain possession must not extend beyond the time of payment or
performance ; nor should this period be so long as to protect or lock
up the property an unreasonable time. But in the present case
debts were due in thirty days ; and the mortgagors were to retain
possession for five years ; unless the plaintiffs deemed it for the se-
curity of the banks to take possession sooner ; that is, if other cred-
itors should attach the property. These terms are unreasonable
and evidently tend to delay and defraud the other creditors.

It may well be doubted whether all the property of an insolvent
can in any case be mortgaged or assigned to secure a part of his
debts ; leaving him in possession, for his own benefit ; or reserving
to him any right in the property, or any surplus. The creditors un-
provided for have the right to all the residue of the property. Yet
here is a secret conveyance, of all the property of an insolvent, for
the benefit of only a part of his creditors, locking up the property
for an unreasonable time, and securing the surplus to the insolvent.
Such a conveyance, no case, it is believed, can be found to sustain.
*Harris v Sumner*, 2 *Pick.* 129 ; *Widgery v. Haskell*, 5 *Mass.*
151 ; *Burlingame v. Bell*, 16 *Mass.* 324 ; *Hills v. Elliot*, 12
*Mass.* 31 ; *Hyslop v. Campbell*, 14 *Johns.* 458 ; *Riggs v. Mur-*
*ray*, 2 *Johns. Chan.* 582 ; *Mackie v. Cairns*, 5 *Cowen*, 547 ; 5
*New Hamp. Rep.* 122.

But here is no proof that any debts were due to the banks for whose
benefit this conveyance was made. Neither the recitals in the instru-
ment, nor the schedules annexed, are any evidence of the fact. And
without proof of the amount of the debts, and a schedule of the
property, no comparison can be made to determine whether the
value of the property conveyed is not excessive, and wholly dis-
proportionate to the amount of debts intended to be protected.

2. If the property in the vessel did not pass to the plaintiffs by
the indenture, neither did it pass by the bill of sale from *Rogers*.

It was built by the company, with its own money; the accounts were kept in its books; and the company was well entitled to hold property of this description, at least against all strangers. If such an employment of its capital was a violation of its charter, and so afforded ground for a prosecution in the nature of a *quo warranto*, this is an objection open to none but the State.

The memorandum of *June* 20, 1827, did not pass the property to *Rogers*. For it was not an agreement made or ratified by the company. And if it were, yet by its terms *Rogers* was not to become the owner without payment; which he was no where bound to make, and never has made. If there was a contract, he took the other alternative, and accounted for the earnings; and had the vessel been lost, the loss would not have been his, but the company's.

But if the indenture is void, then *Rogers* had no authority to convey to the plaintiffs; for no request of the company is shown, except by the indenture. It then is a conveyance by a trustee, without consideration, and without authority from the *cestui que trust;* to persons not ignorant of the trust. Such a conveyance, upon settled principles, is void.

And whatever rights may have been acquired by the plaintiffs under the indenture, they should have taken possession before the rights of other creditors attached to the vessel. Such possession was contemplated by the indenture, and was indispensably necessary to the perfection of their title. *Bartlett v. Williams,* 1 *Pick.* 295; *Mair v. Glennie,* 4 *Maule & Selw.* 240. Here the letters to the master amounted to nothing; he was not governed by them. His possession of the vessel was under the old owners, and not under the new. And the trustees were dilatory in taking possession. The arrival of the vessel was of sufficient notoriety in such a village as to have come to the knowledge of Mr. *King* the same night. He certainly knew it at six the next morning; yet he did nothing, tending to give notice to creditors and complete the sale, till five hours afterwards; and after the attachment.

32

WESTON J. delivered the opinion of the Court at the ensuing *May* term, in *Kennebec.*

The question presented for our consideration is, whether at the time of the alleged trespass, viz. on the sixth of *May* 1830, the plaintiffs were or were not the owners of the schooner *Factor.* As evidence of title in them they rely, first, upon a bill of sale of the schooner, executed to them by *Robert Rogers*, on the twenty fifth of *February*, 1830; secondly, upon an indenture, dated *December* sixteenth, 1829, executed by the *Saco Manufacturing Company*, purporting to convey all the property of the said company to the plaintiffs in trust. By the original enrolment of said vessel, dated *June* twenty ninth, 1827, it appeared that she was built and owned by the said *Rogers.* It was proved by the defendant that *Rogers* built the vessel as agent for the *Saco Manufacturing Company*, out of their funds; and her accounts of earnings, repairs and disbursements, were kept in their books; and it is insisted by the defendant that she was originally, and continued to be, up to the time of the attachment, their property. By a memorandum signed by *Rogers*, on the twentieth of *June*, 1827, an agreement on the part of the company is recited, that she was to be his property, upon his paying to them the amount of all her bills and expenditures; otherwise he was to account to the company for her earnings, and to convey her on demand to whomsoever they might direct. It does not appear that he ever paid to the company her bills and expenditures, but it does appear that they received her earnings; and his bill of sale to the plaintiffs, who claimed to be the assignees of the company, was probably made in pursuance of his agreement before mentioned. Notwithstanding these facts however, it is contended by the plaintiffs that she was to be regarded as *Rogers'* property, they having acquiesced in the oath of ownership made by him, which, if untrue, operated a forfeiture of the vessel. And, secondly, if he held in trust for the company, his conveyance would nevertheless bind them. These positions are controverted on the part of the defendant. Without deciding definitively upon this point, it may be useful to examine the plaintiffs' title, derived from the indenture; for if this

is valid, although that derived from *Rogers* may be defective, by reason of the interest of the company, if they took a legal transfer from the company, prior to the attachment, this objection is removed.

Upon inspecting the indenture, it is found broad enough in its terms to carry this property ; and unless void by reason of fraud, apparent on the face of the instrument, or as evidence of a contract against the policy of the law, it must have that effect. The counsel for the defendant urges many objections against the validity of the instrument, upon both these grounds. That it is a sweeping conveyance by the company of every species of their property, existing or to be acquired, to the plaintiffs in trust. That the company however were to keep possession, so long as the trustees deemed it safe for them so to do, and to carry on their business as before. That this was secretly done. That the trustees thus became the owners of the property for protection, while the company continued to be so for use. That the law will not suffer this double ownership, by which property to a great amount is attempted to be put by insolvent debtors out of the reach of the ordinary process of law. He admits however that in case of a mortgage, possession may be retained by the mortgagor, although he combats this doctrine as unsafe and inconsistent with the old law, and insists that it should be regarded with jealousy and restricted by construction within reasonable bounds. That in point of time its existence was unreasonable, as it might be extended to five years ; and that the use of much of the property, by which it might undergo many transmutations, was inconsistent with the nature of the contract, and the exigency to be provided for. That an assignment of all to pay all is valid, but that this was an assignment of all to pay part, with a reservation of the surplus for the benefit of the assignors. That it is at least fraudulent as a transaction tending to delay creditors ; and, lastly, that there is no evidence of the existence of the debts of the *cestui que trust*, set forth and referred to in the indenture. Many of the objections taken by the learned counsel, will be found by a reference to the cases cited by him, to have been adjudged fatal to transfers absolute upon the face of them, and to be inapplicable to cases of

mortgage. It is assumed by him that the company, when they executed the indenture, were insolvent. This does not appear in the case reserved; and it is insisted that they were then possessed of a large amount of property beyond what was necessary for the payment of their debts, and that they afterwards became insolvent by the burning of their factories, and the consequent breaking up of their establishment. We must look at the facts as they existed at the time the indenture was made. It is obvious that what may be fraudulent in an insolvent debtor, may be fair and unexceptionable, when done by a solvent party.

Whether if the question were now open, it ought to be regarded as wise or expedient, that the mortgagor of personal property should be permitted, without vacating the security of the mortgagee, to keep possession of the property, and to use it as his own, might be a subject of grave consideration, from the frauds with which it may be attended. But the law has been otherwise settled; and we can no longer regard it as an open question. *Haskell v. Greely*, 3 *Greenl.* 425 ; *Reed v. Jewett*, 5 *Greenl.* 96 ; *Holbrook v. Baker*, *ibid.* 309 ; *Badlam v. Tucker*, 1 *Pick.* 389. But the law tolerates this course only for the security of the mortgagee, or if in trust, of those he represents. If there is mingled in the contract an intention to delay or defraud other creditors, or to protect the property from them beyond what may be necessary for the security of the mortgagee, the contract will be deemed to be fraudulent and void. If it be in writing, and such unlawful intention be deducible from the instrument itself, it will be void upon the face of it. And it is open to be impeached upon this ground, by evidence *aliunde*. If by its terms it was to continue a great number of years, this might be deemed evidence of a fraudulent intention ; but we do not think that a stipulation that it might be kept open for five years, in a concern of this magnitude, especially as it does not appear that the company was insolvent, is to be so regarded. If any attempt at concealment of the mortgage had appeared, it might have afforded evidence of fraud, but we hold it a sufficient answer to the objection of a want of publicity, that the attaching creditor was a stockholder in the company, and that the indenture was recorded.

A part of the funds of the company consisted in notes given by stockholders. For this and other reasons, they found it convenient to take large loans of banks, which were disposed to continue the accommodation, if made secure to their satisfaction. To effect this object principally, the indenture was made. The company were to continue their business. For this purpose the loans were procured, and all their arrangements were made to promote this end, which was the very object and design of their institution. To this, the plaintiffs, and the creditors for whom they were to hold the property in trust, were willing to accede. By the indenture therefore, the plaintiffs were to permit, so long as they deemed it safe, the company to sell their manufactured goods, to purchase the raw materials, and to make all necessary disbursements in the prosecution of their business, but the property in the transit, and in its various changes, was to be holden by the plaintiffs, subject to the same trust. We cannot pronounce a transaction of this kind fraudulent upon the face of it. The instrument being recorded, those who had occasion to deal with the company, may be presumed to have been made acquainted with the condition in which they had placed their property. The contract certainly has no features indicating positive fraud, nor does it appear to us to amount to legal or constructive fraud.

In *D'Wolf v. Harris.* 4 *Mason,* 515, Justice *Story* decided that an assignment of goods at sea and their proceeds, if *bona fide,* is sufficient to transfer the legal title to the goods and also to the proceeds; and that an assignment may, in point of law, be valid of goods and their proceeds, though given by way of mortgage, or as security for future advances. He further decided that the possession and management of vessels and cargoes by the mortgagors, if consistent with the deed, at least until condition broken, is perfectly fair and legal, and does not vitiate the security of the mortgagee.

In *Conard v. The Atlantic Ins. Co.* 1 *Pet.* 449, it is laid down by the court, that in cases where the sale is not absolute but conditional, the want of possession, if consistent with the stipulations of the parties, and *a fortiori,* if flowing directly from them, has never been held to be, *per se,* a badge of fraud. Justice *Story,* by whom the opinion of the court was delivered, speaks with approbation of

the case of *Bissell v. Hopkins*, 3 *Cowen*, 166 ; and he adds that there is appended to this case a learned note by the reporter, " which embodies, in an exact manner, the principal authorities, English as well as American, upon this subject." In that case, and in the elaborate note subjoined, commended as it is by the high authority just cited, will be found an answer to many of the objections made by the counsel for the defendant.

The indenture embraces the whole property of the company ; but if made to secure the mortgagees, unless with the further intention also to cover the property, which does not appear, and which is not to be presumed, it is not illegal. As to a resulting trust in favor of the company, after the objects of the mortgage have been fulfilled, it would have been implied by law, if it had not been expressed, and flows necessarily from the nature of the contract. No evidence of fraud has been produced *aliunde.* It has been insisted that no adequate consideration has been proved. We are called upon to pronounce the indenture fraudulent upon the face of it ; but it being evidence in the case, we must take the consideration, upon which it purports to have been executed, to be true. It was open to be disproved by the defendant, impeaching the instrument upon the ground of fraud. This has not been done or attempted, and the question referred to us is, assuming the averments and recitals in the indenture to be true, is fraud apparent ? But if not at liberty to assume their truth, still less, without proof, can we assume their falsity, as the basis of our decision.

Regarding then the indenture as fair and legal, which we feel bound to do, as such it transferred the vessel in question then at sea to the plaintiffs, subject to be defeated by their negligence in not taking possession of her within a reasonable time, after her return to port. *Putnam v. Dutch*, 8 *Mass.* 287 ; *Badlam v. Tucker*, 1 *Pick.* 389 ; *Conard v. Atlantic Ins. Co.* 1 *Pet.* 449. What precise period is embraced under the term, 'reasonable time, and when that degree of negligence is imputable, by which a transfer of this kind is vacated, has not been distinctly settled, to a day or an hour. In *Gardiner v. Howland*, 2 *Pick.* 602, *C. J. Parker* states, that the transfer of a ship at sea remains valid, unless there have been

such negligence in taking possession, when the ship arrives, as will afford ground for the presumption of fraud. It was there deemed important that the assignees forwarded notice of the transfer to the captain. In *Mair v. Glennie*, 4 *Maule & Selw.* 240, it is deducible from the opinion of the court, that notice of the transfer of the ship, then in controversy, to the captain, would have been equivalent to the taking of possession. The letters, which form part of this case, of *Robert Rogers*, and of *Jonathan King*, one of the plaintiffs, dated *April* twenty fourth, 1830, to the captain, whether distinctly understood by him or not, were doubtless intended to apprize him of the fact that the vessel, of which he was master, had become the property of the plaintiffs. The vessel arrived at *Saco*, her home port, in the evening. Early the next morning the fact of the transfer of the vessel was communicated to the master by *King* in clear and distinct terms, accompanied with directions as to the part of the wharf, at which she should be placed. Before eleven o'clock on the same morning, *King* went on board of the vessel himself, and repeated the same directions. It does not appear to us that the case presents any such negligence on the part of the plaintiffs, as will justify the inference of fraud, or that possession was not taken within a reasonable time.

*Judgment for the plaintiffs.*