ABIRAM H. AUSTIN vs. A. & W. SPRAGUE MANUFACTURING COMPANY et als.

The A. & W. Sprague Manufacturing Company, the copartnership of A. & W. Sprague, Amasa Sprague, William Sprague, Mary Sprague and Fanny Sprague widows, executed to Z. Chafee a trust deed of all their estate not exempt from attachment, dated November 1, 1873, reciting that the corporation, the copartnership, Amasa and William were largely indebted, that the corporation had made its notes dated January 1, 1874, payable in three years with interest semi annually, indorsed by the copartnership, and had placed them in the hands of the trustee to retire their indebtedness if brought in within nine months, and that the preservation of the manufacturing properties of the corporation and the interests of the creditors required that the business should be continued.

The deed was to be void if the grantors paid the notes and the expenses of the trust; the grantors were to retain possession until default or entry or sale by the trustee, who at any time before such default and with or without entry had full power of sale, and had full power of entry before or after default, and power to continue or close the business at his discretion. Sixty days after default the trustee could, and on request of one fifth in amount of the note holders should, make sale and hold the proceeds to pay sale expenses, insurance, taxes, trustee's compensation, counsel fees, and the expense of carrying on the business, and to pay the notes placed in his hands by the grantors and by him issued.

Provision was made for the appointment of new trustees if needed.

The grantors covenanted to give such further assurances and conveyances as were required, to pay insurance, to pay over profits to the trustee, to pay taxes and assessments.

The corporate stock of the grantors was excepted from this conveyance, but such stock was to be transferred to the trustee on his request, by way of pledge and collateral security to secure the performance of the conditions of the conveyance.

Held, that the conveyance was a mortgage deed, was valid, and was not in fraud of non assenting creditors.

Provisions in a deed of conveyance not radically fraudulent, but only primâ facie dishonest, may be explained by evidence showing the circumstances of its execution and tending to remove the inference of fraud.

BILL IN EQUITY to compel the transfer of corporate stock.

November 1, 1873, the A. & W. Sprague Manufacturing Company executed the following deed, which was acknowledged and delivered December 1, 1873:

"This Indenture, made and entered into this First Day of November, A. D. Eighteen Hundred and Seventy Three, by and between the A. & W. Sprague Manufacturing Company, a corporation created by the General Assembly of the State of Rhode Island, and transacting business in the city of Providence, Wil-

liam Sprague, of South Kingstown, Amasa Sprague, of Cranston, Mary Sprague, widow of William Sprague, deceased, Fanny Sprague, widow of Amasa Sprague, deceased, of said Providence, all in said State, and the said Amasa Sprague and William Sprague, as copartners doing business under the firm of A. & W. Sprague, as parties of the first part, and Zechariah Chafee, of said Providence, as party of the second part.

" Witnesseth : whereas, the said A. & W. Sprague Manufacturing Company, and the said A. & W. Sprague, and said Amasa Sprague and William Sprague individually, are now indebted or under liability primary or secondary, in divers sums of money to divers persons, amounting in the aggregate to about the sum of Fourteen Millions of Dollars, and which indebtedness and liabilities said parties of the first part are desirous of funding, and securing by the conveyance of their estates and properties to said party of the second part as mortgagee in trust, as hereinafter provided, and which conveyance to him, as mortgagee in trust, said party of the second part has agreed to, and by signing these presents does accept :

" And whereas, for this purpose and to this end, said A. & W. Sprague Manufacturing Ccmpany have executed their Sixteen Thousand Five Hundred negotiable promissory notes, all bearing even date with these presents, and made payable to the order of said A. & W. Sprague, and by them indorsed, payable three years from January 1, 1874, with interest from January 1, 1874, payable semi annually at the rate of seven and three tenths *per centum per annum* till said principal sum is paid, whether at or after maturity, and all instalments of interest in arrear to bear interest at the rate aforesaid till paid, but reserving the right to pay said notes before maturity, in instalments of not less than five *per centum* of the principal thereof, at any time the semi annual interest becomes payable ; principal and interest payable at the place of business of said A. & W. Sprague Manufacturing Company, in said Providence, said notes being of the amounts, and lettered and numbered as follows, to wit : Two Thousand thereof for Fifty Dollars each, lettered A No. 1 to A No. 2,000, both inclusive ; Three Thousand thereof for One Hundred Dollars each, lettered B No. 1 to B No. 3,000, both inclusive ; Three Thousand thereof

for Two Hundred Dollars each, lettered C No. 1 to C No. 3,000, both inclusive ; Three Thousand thereof for Five Hundred Dollars each, lettered D No. 1 to D No. 3,000, both inclusive ; Four Thousand thereof for One Thousand Dollars each, lettered E No. 1 to E No. 4,000, both inclusive ; and Fifteen Hundred thereof for Five Thousand Dollars each, lettered F No. 1 to F No. 1,500, both inclusive ; and all of which notes have been placed in the hands of said party of the second part, to be by him used and applied to the payment or retiring of such of the present outstanding indebtedness and liabilities aforesaid as the holders thereof shall, within nine months from the date of these presents, bring in and surrender and discharge or agree to extend for the term and according to the provisions of said notes ; said notes, as so issued by said trustee, to be countersigned by him.

" And whereas, the preservation of the manufacturing properties of said A. & W. Sprague Manufacturing Company and the best interests of the creditors require, to prevent great loss and shrinkage, that the business of the mills and print works shall in the mean time be continued ;

" Now, therefore, said parties of the first part, in consideration of the premises and of the trusts hereinafter declared, and in further consideration of one dollar to them paid by said party of the second part, the receipt of which is hereby acknowledged, do hereby give, grant, bargain, sell, and convey unto the said party of the second part, his heirs, executors, administrators, and assigns, all the property, real, personal, and mixed, not exempt from attachment by law, which the parties of the first part, or any or either of them, have and hold in the following city and towns in the State of Rhode Island, viz. : the city of Providence, the towns of Cranston, Johnston, Coventry, East Greenwich, West Greenwich, South Kingstown, Warwick, Pawtucket, Lincoln, North Providence, Cumberland, East Providence, and North Kingstown ; in the following towns of the Commonwealth of Massachusetts, viz, : Attleborough and Palmer ; in the following counties of the State of Maine, viz.: Somerset, Piscataquis, Franklin, Kennebec, Penobscot, and Aroostook ; in the following counties of the State of New Hampshire, viz.: Grafton, Coos, Carroll, and Belknap ; in the towns of Richmond and Lexington, in the State of South

Carolina; in the city of Washington, in the District of Columbia; in the following towns of the State of Connecticut, viz.: Sterling, Sprague, Scotland, and Windham, including, in what is known as the Baltic Mill property in said State of Connecticut, 4 iron water wheels, 4 rotary pumps, 3 openers, 20 lappers, 412 cards, 19 double heads, 6 doublers, 5 grinders, 19 railway heads and troughs, 30 drawing frames, 25 coarse speeders, 49 fine speeders, 275 spinning frames, 34 spoolers, 16 slasher warpers, 4 slashers, 20 warpers, 12 dressers, 36 pairs mules, 1,973 looms, 1 boring machine, 1 upright drill, 2 iron planers, 8 turning engines, 1 circular saw, 1 vertical saw, 1 wood planer, 1 gear cutter, 2 bolt cutters, 1 run of grist mill stones, 1 bolter for grist mill, 1 corn cracker, 1 steam fire engine, 3 gas retorts, and all the taps, dies, and tools appertaining to the machine and blacksmith's shops; and including, in what is known as the Oneco property, in said State of Connecticut, 250 stone hammers, 750 drills, and the tools and apparatus used in quarrying and cutting stone; and including, in what is known as the South Windham property, the saws and tools in the saw mill; and including the hay in barns and elsewhere, in either of said towns of the State of Connecticut; and including, generally, within the foregoing description, the two homestead estates, the Washington and Cove Street lot, the Dyer Street lot, the Dorrance Street lot, the Pine and Page Street lot, the Peace Street lot, the Marine Railway property, the lot on the corner of Hope and Waterman Streets, the Fenner Avenue lot, the Martin Street property, the George Pitman and Ives Street property, the Elmwood Store property, and the Ninth Ward property, in the city of Providence; the Cranston Print Works property, with about eighteen hundred and seventy acres of land and improvements thereon, in the town of Cranston; the Natick Mills property, with about eight hundred and thirty acres of land and improvements thereon; and the Ladd farm, with about one hundred and one acres of land and improvements thereon, sometimes called the Coweset estate, in the town of Warwick; the Morgan Mill property, with about six hundred and twenty five acres of land and improvements thereon, in the town of Johnston; the homestead estate in South Kingstown, with about four hundred and twenty eight acres of land and improvements thereon; the Mill

property, in Augusta, Maine, with about four hundred acres of land and improvements thereon ; the Mill property in Palmer, Massachusetts, with about seven acres of land and improvements thereon ; the estates in the city of Washington, with about six acres of land and improvements thereon ; the property in the city of Columbia, in the State of South Carolina, with about four hundred acres of land and improvements thereon ; and also all other the estate and property, real and personal, of every name and nature, not exempt from attachment by law, wherever situate, and by whatsoever muniments of title evidenced, which any or either of the parties of the first part have, or may be entitled to, in possession or action, reversion or remainder ; together, also, with all goods, stock, and supplies, manufactured, unmanufactured, and in process of manufacture, and all fixtures, machinery, tools, and other personal property, of every kind, which said A. & W. Sprague Manufacturing Company may, at any time, or from time to time, hereafter have either in lieu of or in addition to those now on hand ; but excepting from this conveyance all shares of capital stock, in any and every corporation, wherever located, belonging to any or either of the parties of the first part, the same to be transferred to said party of the second part upon his request in writing, by way of pledge and collateral security, to secure the performance of the conditions of this instrument.

" To have and to hold said granted and bargained premises, with all the rights, privileges, and appurtenances thereof, unto and to the use of him, the said party of the second part, his heirs, executors, administrators, and assigns, in trust for the intents and purposes, and with, under, and subject to the powers and provisos hereinafter contained, but subject, nevertheless, to the following condition, that is to say,

" Upon condition, that if said parties of the first part, or any or either of them, their heirs, executors, administrators, or assigns, or any person for them or in their behalf, shall well and truly pay or cause to be paid all and singular the debts and liabilities aforesaid which shall be brought in under these presents, and remain outstanding, as hereinbefore provided, and all expenses and liabilities of every kind incurred in the execution of the trusts hereinafter created or declared, and all the notes aforesaid that shall be

issued by the trustee aforesaid, together with the interest thereon, according to the tenor thereof, then this deed shall be and become void, otherwise shall remain in force.

" And subject to the condition aforesaid, IN TRUST for said party of the second part, and other the trustees or trustee under these presents for the time being, to stand seized and possessed of the said granted estates and premises ; and until default shall be made in the performance of the conditions aforesaid or any part thereof, or breach shall be made of the covenants or agreements hereinafter contained on the part of said parties of the first part to be kept or performed, or until sale under the trusts hereinafter declared, or until entry under the power in that behalf hereinafter contained, to permit and suffer said parties of the first part to retain the possession and use of said granted premises ;

" Provided, and it shall be lawful for said trustees or trustee for the time being at any time, or from time to time, before such default or breach, and with or without previous entry, in their or his discretion to sell, at public or private sale, any part or parts of said granted estates and property, and to execute and deliver such deed or deeds as may be necessary or proper to vest in the purchaser or purchasers thereof an absolute and indefeasible estate in fee simple therein, and to stand seized of all the purchase moneys to arise and be received therefrom, for the uses and purposes hereinafter declared respecting the same ;

" And provided further, that said trustees or trustee for the time being may at any time, or from time to time, before default or breach as well as after, enter upon said granted estates and property, or any part or parts thereof, and take and assume the full and absolute possession and control of the same, and in their or his discretion to continue to run and operate, or to close, the mills or print works of said Manufacturing Company, or any or either of them, as said trustees or trustee for the time being shall deem for the best interests of the creditors ;

" And provided also, and it is hereby further declared, that in case default shall be made in payment of said notes hereby secured, or any or either of them, or of the semi annual interest due thereon, or breach shall be made of either of the covenants or agreements herein contained on the part of said parties of the first

part to be kept and performed, and such default or breach shall continue for the space of sixty days, then in such case the said trustees or trustee hereunder for the time being, in their or his discretion, may, and upon the request in writing of the holders of one fifth in amount of the notes then issued and outstanding under these presents, said trustees or trustee for the time being shall, from time to time thereafter, either before or after entry as aforesaid, sell, either together or in parcels, the estates and property aforesaid, or any part or parts thereof, at public or private sale, as said trustees or trustee shall think best, first giving, in case of any auction sale under this or under any other provisions of this instrument, notice thereof by advertisement at least twice a week for four successive weeks in some public newspaper printed in said Providence, and such other notice as they or he may deem advisable ; and upon sale thereof to execute and deliver such deed or deeds as may be necessary or proper to vest in the purchaser or purchasers thereof an absolute and indefeasible estate in fee simple therein.

" And it is hereby declared that said trustees or trustee for the time being shall stand seized of all the purchase moneys to arise and to be received from sales or otherwise under any of the trusts of these presents, to apply and appropriate the same ;

" First, to the payment of all expenses incident to such sale or sales, and of all insurance moneys, taxes, and other charges, if any, paid or incurred by them in respect of said trust estates, together with a reasonable compensation to said trustees or trustee for the time being for his or their own services, and reasonable counsel fees, and all other charges and liabilities paid or incurred by them either in carrying on the business or in the execution of any other of the trusts hereby created ;

" And, secondly, the residue of all moneys received by them under any of the trusts of this instrument, from time to time, to apply and appropriate ratably to the payment of the principal and interest of all the debts and liabilities aforesaid of said parties of the first part which shall be brought in under these presents and remain outstanding as aforesaid, and of all the notes that shall be issued by said trustee and be outstanding under and secured by these presents, and although by their terms the same

may not then have matured; accounting to said parties of the first part respectively, their heirs, executors, administrators, or assigns, for any surplus, if any, that may remain after the full payment thereof.

"And it is further declared that no purchaser under any or either of the foregoing trusts shall be under any obligation to inquire into the necessity or regularity of any sale thereunder, nor to see to the application of any of the purchase moneys thereof, but that the receipt of the trustees or trustee for the time being to such purchaser or purchasers for such purchase moneys shall be his or their full and effectual acquittance and discharge therefor. And if at any time said trustee, or any trustee to be appointed under these presents, shall be desirous of resigning and of being discharged from the trusts aforesaid, it shall be lawful for them or him so to do; and in such case, or in case said trustee, or any trustee to be appointed under these presents, shall die or become incapable of acting in said trusts, it shall be lawful for the surviving or continuing trustees or trustee for the time being, by any writing or writings under their or his hands, to nominate and appoint, or in case at any time all the trustees for the time being shall resign together, then for the Supreme Court of the State of Rhode Island sitting in equity to appoint any other person or persons to be a trustee or trustees in the stead and place of him or them so dying, resigning, or becoming incapable of acting as aforesaid, and thereupon, and as often as any such appointment shall be made, all the trust estates and property then held under the trusts aforesaid shall with all convenient speed be so conveyed, assigned, and transferred as to vest the same in the surviving or continuing trustees or trustee, and such new trustees or trustee, or if there be no continuing trustee, then in such new trustees or trustee only, their or his heirs, executors, administrators, and assigns, to the same uses and upon the same trusts as are herein declared concerning the same. And every new trustee under these presents so appointed, or otherwise duly appointed by any court of competent jurisdiction, may immediately exercise any power or discretion herein granted, in the same manner as though originally named as trustee herein, and although the trust estate be not then vested in him. And no trustee under these presents shall be

answerable or accountable for any loss which may happen to said trust estate or property, unless the same shall happen by his own neglect or default.

" And the said parties of the first part, for themselves and for their respective heirs, executors, administrators, and assigns, do hereby covenant with the said party of the second part, his heirs, executors, administrators, and assigns, at any time or from time to time during the continuance of this security, to execute and deliver to the party of the second part, or other the trustees or trustee under these presents for the time being, or to any purchaser under any of the foregoing trusts, such further conveyances or assurances of the estates or property hereby conveyed or intended to be conveyed, or any part or parts thereof, as said trustees or trustee for the time being may reasonably require ; and, at all times during the continuance of this security, at their own cost and charges, to keep and maintain insurance, for the benefit of said party of the second part under these presents, upon the mills, buildings, machinery, and other insurable property hereby conveyed or intended to be conveyed, in such reasonable amounts, and in such insurance companies, as said trustees or trustee for the time being shall approve ; also that the profits that shall hereafter accrue in the business of said manufacturing company shall, from time to time, be by said company paid over to said trustees or trustee for the time being, to be held and applied to any of the purposes aforesaid, in the same manner as the other trust moneys under these presents ; also to pay all taxes and assessments, rates, and charges, of every nature that may be laid or levied upon or in respect of said granted premises ; and in default thereof it shall be lawful for said trustees or trustee for the time being to effect such insurance, and to pay said taxes, assessments, rates, and charges, and all sums paid therefor shall be a further lien upon said granted premises secured by these presents.

" In testimony whereof, said A. & W. Sprague Manufacturing Company have caused these presents to be signed, and its corporate seal to be hereto affixed by said Amasa Sprague, its treasurer, for this purpose fully authorized, and said other parties of the first and second parts have hereunto set their hands and

seals, this said first day of November, A. D. Eighteen Hundred and Seventy Three.

|  |  |
|---|---|
| " A. & W. SPRAGUE M'F'G CO., BY AMASA SPRAGUE, *Treas.* | [L. S.] |
| " WILLIAM SPRAGUE, | [L. S.] |
| " AMASA SPRAGUE, | [L. S.] |
| " MARY SPRAGUE, | [L. S.] |
| " FANNY SPRAGUE, | [L. S.] |
| " A. & W. SPRAGUE, | [L. S.] |
| " ZECHARIAH CHAFEE, | [L. S.] |

" Signed, sealed, and delivered }
   in presence of  }

 THOS. A. DOYLE,

 F. W. LATHAM,

 GEORGE HARRIS."

" The State of Rhode Island, &c.,   }
  City and County of Providence, } ss.

 " Be it known, that in said city of Providence, on this first day of December, A. D. 1873, before me, Henry Martin, a Justice of the Peace for the said city of Providence, a Notary Public for said State of Rhode Island, and a Commissioner for the State of New York, residing in said city of Providence, personally appeared Amasa Sprague, Fanny Sprague, and Mary Sprague, who are personally known to me to be the same persons described in, and who signed, sealed, and executed the foregoing instrument, and they then and there severally acknowledged to me that they signed, sealed, executed, and delivered the said instrument as, and that the same is, their free and voluntary act and deed, for the uses and purposes therein mentioned and expressed; and, at the same time and place, the said Amasa Sprague, also personally known to me to be the same person who executed the foregoing instrument as treasurer, in his capacity as treasurer of the A. & W. Sprague Manufacturing Company, also acknowledged to me that he signed, sealed, executed, and delivered the said instrument as, and that the same is, his free and voluntary act and deed as such treasurer, and the free and voluntary act and deed of the said A. & W. Sprague Manufacturing Company, for the uses and purposes therein mentioned and expressed.

" In testimony whereof, I have hereunto set my hand and official seals at said city of Providence on this said first day of December, A. D. 1873.

[L. S.]      [L. S.]      HENRY MARTIN,
*Justice of the Peace, Notary Public,*
*and Commissioner for the State of New York.*"

" State of Rhode Island,      ⎱ ss.
  City and County of Providence, ⎰

" Be it known, that in the city of Providence, on this sixth day of December, A. D. 1873, before me, Henry Martin, a Justice of the Peace for said city of Providence, a Notary Public for said State of Rhode Island, and a Commissioner for the State of New York, residing in said Providence, personally appeared William Sprague, to me personally known, and he then and there acknowledged to me that he signed, sealed, and executed, and delivered the foregoing instrument as his free and voluntary act and deed. In testimony whereof, I have hereunto set my hand and seals at said city of Providence on this eighth day of December, A. D. 1873.

[L. S.]      [L. S.]      HENRY MARTIN,
*Justice of the Peace, Notary Public,*
*and Commissioner for the State of New York.*"

January 1, 1874, the A. & W. Sprague Manufacturing Company executed and delivered the following deed :

" Know all Men by these Presents, That the A. & W. Sprague Manufacturing Company, in consideration of one dollar to them paid, and of the trusts hereof, do by these presents sell, assign, and transfer one hundred twenty two (122) shares of the capital stock of the Phenix Iron Foundry, Providence, R. I., subject to all existing liens upon the same, to Zechariah Chafee, of Providence, R. I., in trust, to sell the same and apply the proceeds, first to the payment of the debts, liabilities, and expenses secured by a certain mortgage from this company and other parties to him, dated November 1st, 1873 ; and secondly, the surplus proceeds, if any, to pay and distribute ratably to and among all their other creditors.

" In witness whereof the said A. & W. Sprague Manufacturing

Company hath caused this transfer to be executed and its corporate seal to be hereto affixed by Amasa Sprague, its treasurer, thereto duly authorized, this first day of January, 1874.

"A. & W. SPRAGUE MF'G. CO.,   [L. S.]
PR. AMASA SPRAGUE, *Treas.*

"Signed, sealed, and delivered }
    in presence of    }
    GEORGE HARRIS."

At the October Term of this Court, 1882, one Horatio N. Waterman, a creditor of the A. & W. Sprague Manufacturing Company, who had never assented to the above deeds, obtained a judgment against it,[1] took out execution in due course of law, and caused levy to be made on the above one hundred and twenty two shares in the Phenix Iron Foundry. At the sheriff's execution sale these shares were purchased by Abiram H. Austin, who, after receiving a deed from the sheriff, and after making demand upon the Phenix Iron Foundry, the A. & W. Sprague Manufacturing Company, and Chafee, for a conveyance to him of these shares, filed this bill against the Sprague Manufacturing Company, the Foundry, and Chafee to obtain the stock, claiming that the above deeds, to which Austin had never assented, were void as in fraud of creditors.

*April* 4, 1884. STINESS, J. The main question raised by the pleadings is whether the conveyance to Chafee is in fraud of creditors. The complainant contends that it is necessarily so from its character, recitals, and provisions, and that no extrinsic evidence can be admitted to explain the circumstances and intent of its execution.

If a conveyance be fraudulent as to creditors it is quite immaterial what form it may take, whether deed, lease, or mortgage; it will be set aside. Nevertheless the form of conveyance may be very material in determining whether it is in fraud of creditors. For example, the deed by a solvent debtor of all his property to pay one of his creditors must be fraudulent; a mortgage of it to pay a single debt would not be. The former, in the case assumed, would undertake to put all the debtor's estate beyond process of law, for an inadequate consideration, to the detriment of his re-

---

[1] See *Waterman* v. *Sprague Manuf. Co., ante,* p. 43.

maining creditors ; the latter would simply give security for payment *pro tanto,* leaving the balance open to them.

The instrument before us is a mortgage. It is a conveyance as security for a debt ; conditional and defeasible upon payment at a fixed time ; with power of sale in case of default ; with equity of redemption in the grantors, and account to them for surplus.

The only provision which is urged as giving to it the character of a deed is that which empowers the trustee, before default, in " his discretion to sell at public or private sale any part or parts of said granted estate or property."

While this is an unusual provision in a mortgage, we do not think it is sufficient to change its character. It is not a direction to sell, nor an authority to sell the whole, but " part or parts ; " and the extent and variety of the estate mortgaged, as disclosed by the description, suggests that the clause has reference to the sale of parts which it may be found imprudent or inexpedient to keep during the term of the mortgage. But, however this may be, the proceeds of such a sale are to be held subject to the mortgage, so that the provisions amounts only to a permission to substitute one form of property for another of equal value ; a provision not uncommon in mortgages of personal property.

The instrument was recognized as a mortgage in *Chafee* v. *Fourth National Bank,* 71 Me. 514, and decided to be a mortgage in *De Wolf* v. *Sprague Manufacturing Co.* 49 Conn. 283 ; in *Stafford National Bank* v. *Sprague,* 17 Fed. Reporter, 784 ; and in *Union Company* v. *Sprague, ante,* p. 452.

Under our statute, Pub. Stat. R. I. cap. 173, § 1, as under the 13th Eliz. cap. 5, a conveyance made with the intent or purpose to delay, hinder, or defraud creditors of their just and lawful actions, debts, &c., is void as to a non assenting creditor. In administering these statutes three rules have been recognized :

*First.* The purpose of a deed may be so written into it that it can neither be read nor carried into effect without disclosing a fraud incapable of explanation or defence ; its provisions may be so inconsistent with real honesty as to be referable only to a fraudulent intent.

*Second.* Provisions not thus radically, but only apparently or *primâ facie,* dishonest may be explained by the circumstances of

the execution of the deed tending to remove the inference of fraud. *Boone* v. *Hardie*, 83 N. C. 470 ; *Cheatham* v. *Hawkins*, 76 N. C. 335 ; *Jones* v. *Huggeford*, 3 Met. 515, 519 ; *Briggs* v. *Parkman*, 2 Met. 258; *Sleeper* v. *Chapman*, 121 Mass. 404 ; *Finch* v. *Holmes*, 67 Me. 186 ; *Hapgood* v. *Fisher*, 34 Me. 407 ; *Alton* v. *Harrison*, L. R. 4 Ch. App. 622 ; *In re Johnson*, L. R. 20 Ch. Div. 389.

*Third.* A deed unimpeachable on its face may be shown to be contrived of fraud by the facts which induced it.

In other words, fraud is the gist of an inquiry under the statute, and it must appear either from the nature of the transaction or intent of the parties. In ascertaining it, however, a court is not tied to the words of a deed, and because of them compelled to say that a transaction is fraudulent which is not so in fact. The words may be so plain as to betray their illegal purpose or effect, or so questionable as only to arouse suspicions which may be dispelled upon knowledge of surrounding facts ; but if through them, by the light either of circumstances or necessary results, the court can see that there was or was not fraud, it will judge accordingly. In the forcible language of Chief Justice Ames in *Nightingale* v. *Harris & Lippitt*, 6 R. I. 321, 329 : " Without doubt an assignment for the benefit of creditors may contain a clause so plainly indicative of the fraudulent intent pointed at by the statute as to carry its death wound upon its face ; such as a gratuitous provision out of the assigned property for the insolvent assignor or his family. Except, however, in such glaring cases, incapable of any just or honest explanation, we should be departing far from the usage of well instructed courts of any sort, and especially courts of equity, if we should attempt to pronounce upon the intent of the maker of any instrument without the aid of all those facts relating to the subjects and objects of his conveyance, which, by placing us in the precise point of view from which he contemplated his act, will enable us to ascertain what he intended by the language he used, and, consistently with that language, why he intended it."

In accordance with the rule thus expressed this court, in the recent case of *Gardner* v. *Commercial National Bank*, 13 R. I. 155, sustained the demurrer to a bill brought by assignees against

attaching creditors, upon the ground that under the demurrer the question was simply whether the assignment taken by itself, *without explanatory allegations or proofs*, should be regarded as valid.

A second bill was filed by the same assignees, the assignors joining with them, setting forth the condition of the business and property in explanation of the provisions of the deed, to which the attaching creditors also demurred.

There is no reported opinion upon this demurrer, but the following rescript is entered in the minute book of the clerk of the court: "The court are of the opinion that the complainants, Sackett, Davis & Co., are entitled to prove that the discretionary powers contained in the trust deed made by them were consistent with an honest intent, and were not inserted in the deed for the purpose of hindering, delaying, or defrauding creditors."

There is no question about the rules stated above, excepting the second, *i. e.* that the provisions of a deed, not necessarily fraudulent, may be explained by extrinsic evidence, and in respect to this, we regard the cases just referred to as settling the law for this State. But most of the cases in other states to which we have been referred by the complainant are, after all, in apparent rather than in real conflict with our own and those which we have cited. In the former the courts first find that certain provisions in deeds are necessarily fraudulent, and then say that such provisions cannot be explained by parol. But that is what we have already said. For example, in the elaborately considered case of *Pierson* v. *Manning*, 2 Mich. 445, the court found, "by legal implication, a resulting trust" in favor of the assignor. Of course no evidence could be received in such a case, for the trust would remain the same whether explained or unexplained.

In *Abercrombie* v. *Bradford*, 16 Ala. 560, the court says: "The construction of a deed is a question of law, and if by the terms of the instrument it is void, no other judgment can be pronounced than that it is null and void. To sustain a deed void on its face by resorting to parol proof would be to create a new instrument and then to give effect to its validity." True enough; but this shows that the primary question is whether the deed is *void on its face;* for we venture to say there can be found no case of a deed not held to be necessarily fraudulent by its terms, to which extrinsic evidence is not applicable.

The rule is well stated in *Gere* v. *Murray*, 6 Minn. 305, cited by complainant. " The question of fraudulent intent is a mixed question of law and fact; that is, the question of the existence of a certain intent is a question of fact for the jury, when not disclosed by the papers, and for the court to declare whether such intent be fraudulent or otherwise."

In *Alton* v. *Harrison*, L. R. 4 Ch. App. 622, Giffard, L. J., approves the following language of Vice Chancellor Stewart : " In this, as in all other cases of the same kind, the question is as to the *bona fides* of the transaction. If the deed of mortgage and bill of sale was executed by Harrison honestly, for the purpose of giving a security to the five creditors, and was not a contrivance resorted to for his own personal benefit, it is not void but must have effect."

Lord Abinger in *Gale* v. *Williamson*, 8 M. & W. 405, 409, says : " The evidence is used to explain away fraud ; and even in the case of a deed, fraud may be proved or disproved *aliunde.*"

So in Bump on Fraudulent Conveyances, 3d ed. p. 24 : " In the construction of written instruments, the existence of fraud is a question of fact whenever their terms and stipulations are by possibility compatible with good faith, and have upon their face the essential elements of a legal contract."

In the present case, therefore, the question is, are the provisions of the mortgage manifestly fraudulent or do they disclose a fraudulent intent ; if not, are they to be regarded as fraudulent in the light of the circumstances under which they were made.

The complainant claims that whether the A. & W. Sprague Manufacturing Company was solvent or insolvent the deed is void because it placed the property beyond reach of the process of law, securing to them possession for a period of three years. But the instrument being a mortgage, this is not so. If solvent, the grantors simply gave security to those creditors who were willing to extend their claims, and this with the debt would be a valid consideration, leaving the balance of their estate, and enough to satisfy other creditors, open to attachment and sale. If insolvent, it amounted to a preference of these creditors ; which at that time was not only lawful in this State, but which, by itself, has never been regarded as a violation of the statute of Elizabeth. Bump on Fraudulent Conveyances, 3d ed. pp. 183, 184, and cases cited.

The mortgage became operative only as creditors came in under it, and only to the extent of their claims. All could accept its terms if they chose to do so, but, if none accepted, then all the property was open to the process of law. The estate was incumbered just to the extent that creditors accepted the mortgage and thus secured a preference, and all the balance was subject to distribution among non assenting creditors. There is no reservation whatever for the benefit of the grantors, except that of possession until default, which follows every mortgage, and the usual clause relating to an account for surplus, which is nothing more than what the law would imply, and which, therefore, is not fraudulent. In no event could they secure any of the estate for themselves until their debts were paid, for if creditors to the full value of the property accepted the mortgage, then the whole of it was devoted to their payment; if creditors to a less amount came in, then the equity of redemption could be attached and sold by other creditors; nothing would be left for the grantors, for they could be immediately dispossessed. This is the test of a fraudulent conveyance under the statute of Elizabeth. No deed of a debtor can be held to be fraudulent which unreservedly devotes his whole estate to his creditors. But in this case there was not even a delay that was not voluntary. Creditors who chose to do so could give an extension of three years upon their debts, and receive security therefor as preferred claims. The mortgage held only to the extent of the debts thus lawfully preferred, and the remaining interest in the property could be levied upon at once by those who were unwilling to wait. Neither class of creditors therefore was hindered. Those willing to wait and secure a preference might lawfully do so, and those unwilling to do this were free to seize the debtors' interest, the equity of redemption, in the ordinary course of law.

There is a marked difference in this respect between this case and *Gardner* v. *Commercial National Bank*, 13 R. I. 155. The deed in that case was an assignment to trustees, not simply for the purpose of distribution as soon as it could reasonably be done, but with " free, full, and uncontrolled power in their discretion to carry on the said jewelry business of the said parties of the first part, for such time as the said trustees may deem for the best in-

terests of the creditors, and necessary for the purpose of preventing shrinkage and loss, and of closing out and liquidating the same to the best advantage." Under such a deed non assenting creditors would be kept off indefinitely, as long as the trustees might think it proper to run the business; while in the case before us non assenting creditors had the immediate right to take all the property there was over and above the preferred and secured claims. Thus also this case differs from *Green & Trammell* v. *Trieber*, 3 Md. 11, where the deed was held by the court to be in fact an assignment and not a mortgage, under which the debtor reserved to his own possession all the property, real and personal, with all rents and profits, and without paying rent, " for six and perhaps twenty four months, and for so long a time as the trustees may deem proper, provided none of the assenting creditors require the sale to be made."

It is not to be wondered at that some, without right discrimination, should think that a deed which gives a preference to certain creditors is a fraud upon others; for since the federal bankrupt act and statutes, in our own and other states, to prevent preferences, many have come to think that they are inherently fraudulent. But in this matter we have nothing to do with the bankrupt act, nor with our statute against preferences, which was not passed until nearly five years after the date of this deed. We have to do with a pure question under the statute of Elizabeth, and at that time the law of this State was by no means peculiar in holding that the statute did not forbid an assignment with preferences, much less a mortgage to secure debts.

It does not appear that the Spragues knew whether they were solvent or insolvent when the deed was executed. They knew that they were unable to meet their indebtedness as it matured, but, as appears by the report of the committee of creditors, it was supposed that they could ultimately pay their liabilities. The first step in these proceedings was taken, at the request of the A. & W. Sprague Manufacturing Company, by banks in the city of Providence holding its paper, who appointed a committee to investigate its affairs, and to " express their recommendation of the best course to be taken under the circumstances." The committee recommended that the corporation and its individual stock-

holders " mortgage all their property to three trustees, who shall practically have all control and management of the entire property," to secure notes covering the indebtedness.

They expressed their belief that " if the trustees have the full authority asked for them, they will be able to avert a great calamity to thousands of operatives, make the mill properties valuable, prevent an immense further shrinkage of values, and pay in full the indebtedness." A mortgage was prepared pursuant to this advice, submitted to a large and general meeting of creditors, by them referred to a committee, who employed eminent counsel to examine the instrument critically and to suggest amendments, and, as a result, the mortgage was agreed to in its present form. The three trustees named by the creditors having declined to serve, the respondent Chafee was substituted as sole trustee, and the mortgage executed without further change. Under these circumstances the deed might as well be called the act of the creditors as of the debtors ; and if any of its provisions betray in fact, or as a result, an intent " to delay, hinder, or defraud creditors," it must be that they themselves were inconceivably blind to their own interests, or bent upon contriving an instrument for their own hurt. It would indeed be a severe commentary upon the intelligence of the business men who composed and represented the creditors of this estate to find that, to an amount of nearly nine million dollars as against one hundred and fourteen thousand, they assented to a deed the necessary effect of which was to defraud themselves. Still, even though proper in form, this may have been so, and we must therefore look to its details in the light of the facts as they stood at the time of its execution.

And first the complainant urges that the preamble avows a fraudulent purpose in these words : " And whereas the preservation of the manufacturing properties of said A. & W. Sprague Manufacturing Company and the best interests of the creditors require, to prevent great loss and shrinkage, that the business of the mills and print works shall in the mean time be continued." With this may be considered another objection that the deed allows the continuance of the business at the trustee's discretion and at the expense of the estate. Without doubt if the deed put the entire estate into the hands of a trustee to be run for three years

for the benefit of the grantors, whether by him or them, it would be void. Without doubt, also, if it was put into his hands to be run until better times might come, so as to prevent an ultimate " loss and shrinkage " to the debtors, it would be void. But as we have already seen this deed did neither of these things. If the debtors retained possession of the property, as debtors generally do under a mortgage, there would be no liability to the trustee for the expense of the business; but more, the debtors were to pay insurance and taxes, and if there were any profits in the business, those, too, were to be paid over to the trustee. Beyond a bare possession, which the trustee or any non assenting creditor could terminate at any time, and a possible permission to run the mills for three years, not for their own but for the creditors' benefit if profit accrued, there is no sort of reservation for the debtors. What, then, do the phrases " the preservation of the manufacturing properties" and " to prevent great loss and shrinkage " mean ? Evidently not a preservation to the debtors, nor a prevention of loss to them, but to the creditors. It is a matter of common knowledge that idle mills depreciate very rapidly ; and it is also in testimony before us that it is better to run a mill at considerable loss than to stop it. Not only is a going concern far more salable than an idle one, but the choice is between certain depreciation and possible loss. In a mortgage time would follow before default, and if the mills should run, it might be that the business would be such in three years as to aid materially in paying the debts : but if not, the trustee, seeing it, under the power of the deed could sell parts, from time to time, as active instead of dead property, and arrange to sell the whole advantageously at the expiration of the time. In view of the amount, variety, and character of the property, scattered through many towns and states, we do not consider three years an unreasonable time for liquidation and sale. Heed must be given to the nature of the assets. A single shop and a combination of farms, merchandise, and factories cannot be placed under precisely the same limitations. The question then is whether, during such a reasonable time, the trustee could, if he thought it best, be allowed to run the mills, or whether, as a matter of law, they must, of necessity, be closed, to stand in rust and hazard, in shrinkage and waste. In the recent case of *Boldero* v.

*London & Westminster Loan & Discount Company*, L. R. 5 Exch. Div. 47, the deed authorized the trustee to carry on the trade if thought expedient, and it was sustained upon the ground that the primary object was a transfer for purposes of sale as a going concern and not for the purpose of carrying on the business. Pollock, B., says, page 52: " In *Spencer* v. *Slater*, L. R. 4 Q. B. Div. 13, there were special circumstances. In the first place, the deed contained not merely the ordinary resulting trusts as to the surplus, which would be found in every deed, but a resulting trust, under which, at the expiration of twelve months, the debtor might apply to the trustees to be paid the dividends of creditors who neglected or refused to assent to or execute the deed, and then, if the creditors did not within seven days assent or execute, the money was to be paid to the debtor; this was clearly much beyond the ordinary resulting trust: then again, in that case, the primary trust was to carry on the business; here the principal object is to sell the business, and it is subsidiary to that object that power should be given to carry it on till the sale."

Among the English cases that of *Owen* v. *Body*, 5 A. & E. 28, has been much relied on to establish the rule that any provision in a deed which authorizes a trustee to carry on business is fraudulent. But, like *Spencer* v. *Slater*, this case has been held to lay down this rule only in cases where the carrying on of the business was the main and not the subsidiary object. It was discussed, and thus explained, *Janes* v. *Whitbread*, 11 C. B. 406, a case in which a similar deed, allowing the trustee to carry on the debtor's trade " if thought expedient by him," was sustained. Among American cases one of the strongest in favor of such a rule is that of *Dunham* v. *Waterman*, 17 N. Y. 9. It is to be observed of this case, however, that the decision rests solely on the ground that a discretionary power conferred on the trustee by the debtor cannot be controlled by the court. Hence it is said : " If an assignee should err in the exercise of that legal discretion which is incident to his trust, the court, on application of the creditors, could correct the error. If the sale should be unreasonably delayed, the court could hasten it. Not so, however, in respect to a discretionary power expressly vested in him by the assignment." Also, it is assumed that, under the provisions of the deed in that case, creditors might

be " kept at bay so long as the assignee selected by the failing debtor himself may deem it expedient to retain the management of the assigned property." The case was cited in *Gardner* v. *Commercial National Bank, supra,* though Durfee, C. J., said of it: " The New York Court of Appeals probably went further than we should be likely to go in a similar case." We cannot now follow the case for several reasons. *First,* the concurrence of the court in the part of the opinion holding the assignment void on account of the discretionary powers was doubted in *Benedict* v. *Huntington,* 32 N. Y. 219. *Second,* in the latter case and in *Jessup* v. *Hulse,* 21 N. Y. 168, in which, as in *Dunham* v. *Waterman,* the opinion was given by Selden, J., it is expressly stated that a discretionary power which does not go beyond the power which the law would give to a trustee, *i. e.* a reasonable discretion, does not avoid a deed. *Third,* the facts in this case are quite different from those assumed in *Dunham* v. *Waterman.* The trustee is not authorized by this deed to carry on the business indefinitely against the will of all, assenting and non assenting creditors; he is limited to three years, or sixty days after default, and to a request to sell by the holders of one fifth of the notes. As already stated, considering the instrument a mortgage and a preference, with the terms of which, therefore, if not illegal, non assenting creditors can find no fault, the circumstances of its inception and the nature and extent of the estate, we regard the limitations as reasonable and proper, and think that under them the trustee took no greater powers than the court, in view of the facts, would have said he ought to be allowed to exercise, without reference to the deed. After default there is no special discretionary power which permits the trustee to carry on the business at his own will. The deed says he " may " and upon the request of one fifth " shall " sell. This authorizes but does not require a sale except upon the request. Suppose then the trustee and one fifth of the creditors should take no steps for a sale after default, but allow the business to go on, endangering t he margin that might remain for non assenting creditors, what could the latter do ? Clearly they could apply to the court for an order of sale, such as in fact was made in *Quidnick Company* v. *Chafee,* 13 R. I. 367, 381. A similar authority was sustained in *Kendall* v. *New England Carpet Co.*

13 Conn. 383. See, also, *Brinley* v. *Spring*, 7 Me. 241, where a mortgage which allowed the business to be kept open for five years was held not to be fraudulent "in a concern of this magnitude."

The objection that the deed does not provide for the payment of debts existing at its execution, but for new debts to be substituted on January 1st, 1874, is close to cavilling. One of the objects of the mortgage is the "funding" of existing indebtedness. The notes are simply a new form of promise and not a new debt, and by the terms of the deed they are to be given only in exchange or extension "of the present outstanding indebtedness."

Another objection is that corporate, copartnership, and individual property are mingled in one conveyance and for common security and payment. Of course the property of one cannot be taken from his creditors to pay the debt of another. It appears, however, in this case that there was a most remarkable confusion in the affairs of the grantors. The business was carried on by the corporation; some of its property stood in individual names, while some of the individual property stood in the name of the corporation; payments had been made by each on account of the other quite indiscriminately; the individual indebtedness was very small, and that of the copartnership was chiefly on account of indorsement of the corporation notes. Moreover the individuals, as stockholders, were personally liable for the debts of the corporation. In view of these complications, it is quite proper that all the grantors should join in one instrument. If no provision is made for a proper marshalling of assets, or, even if this is prevented by the community of obligation on the notes, still we cannot set the deed aside on that account, except at the request of some creditor who is injured by the diversion of that which belongs to him. Courts give remedies for real not imaginary wrongs. The creditor in this case held his debt against the corporation, and if the private assets exceeded the private liabilities, he, of course, could suffer no harm by the turning in of the balance for corporate debts. It does not appear, nor does the complainant claim, that he has been injured in any way on that account; on the contrary, the evidence shows, in the report of the committee before referred to, that there

was a large surplus of private assets over private debts. It will be time enough to consider this matter fully when some creditor shows that he sustains or has reasonable cause to fear a damage on this account. As the case stands we see no occasion for complaint.

The reservation of corporate stocks is also urged as an evidence of fraud upon creditors. But the same sentence which contains the exception provides that they shall " be transferred to the party of the second part, upon his request in writing, by way of pledge and collateral security to secure the performance of the conditions of this instrument." When it appears that this clause was inserted at the request of the trustees proposed by the creditors, in order to shield themselves from the personal liability of stockholders under our law relating to manufacturing corporations, and that in fact the transfer of all stock was made immediately after the execution of the deed, we fail to see proof of a fraudulent intent. Here, too, the importance of the nature of the instrument is seen again. By it the grantors offered certain property as security to certain creditors. If they reserved anything, it was not out of their hands and was attachable; if they did not put in all, this would not vitiate the conveyance of what was included, for the deed did not purport to be, nor was it, an *assignment* of all their property. As the law then stood, they had the right to transfer or pledge it, in whole or in part, for existing debts. With reference to the stock in question, in this case, it was transferred to be applied to creditors, according to the terms of the mortgage, and the balance ratably among other creditors. We see no fault in this.

The deed before us has been passed upon by the Supreme Court of Errors of the State of Connecticut in *De Wolf* v. *Sprague Manufacturing Co.* 49 Conn. 283. So far as the mortgage is concerned that case was decided on the point that, being a mortgage, the conveyance was invalid because it did not sufficiently describe the property under the law of that State, but the opinion goes on to criticise the deed in other respects. Notwithstanding the faults set forth are simply *dicta*, our respect for the learned court is too high to allow us to overlook their suggestions on these points.

The first criticism is that the deed mingles the debts and assets

of the several grantors, so that if the debts of individuals exceeded their assets something would have to be taken from the corporate assets in the equal distribution, to the loss of the complainant, who was a creditor of the corporation. Had the court been called upon to decide the case upon this point, they would, doubtless, have asked whether this was so. They probably would not have set the deed aside for the reason that under imaginary circumstances the complainant might suffer an injury when in fact he had not suffered one. The machinery of the law works to set right real wrongs and not abstract propositions. If it should turn out that the balance was in the complainant's favor, he could not object on that account, while individual creditors, who in such case would be entitled to the difference, might waive their claim to it if they chose. The court say that as the deed does not disclose the relative debts and assets, it was unreasonable to expect a creditor to assent to it. It seems to us that this is a question of fact. If it appeared that the creditor was fully apprised of the situation at the time, by the report of a committee or otherwise, and that the arrangement was thus made to avoid serious complications, would the court feel compelled to say, notwithstanding, it is a deed " contrived of fraud, covin, collusion, or guile, to the intent or purpose to delay, hinder, or defraud creditors ?" Under certain circumstances the terms of the deed might have injured the complainant, and in their criticism the court, probably inadvertently, stated this as conclusive without stopping to ask whether the deed did so in fact.

The other ground of objection to the mortgage in the opinion is that it empowered the trustee to run the mills at the expense of the estate. The court make no account of the fact that, if he had to take possession of the property, sure loss would follow from idleness, unless he could have such authority. Under the mortgage, " The diligence of the provident man is the measure of the trustee's duty," for he is held accountable for any loss which happens from his neglect or default. It could not be expected that a trustee would take all the chance of loss from business upon himself, and unless he can be thus authorized to run the mills they cannot be run at all. It would be a harsh rule of law that would forbid to creditors a choice between possible and certain loss : be-

tween the advantage that would arise from the sale of a going concern and the disadvantage that might come from unsuccessful business. The court further say, " if profits should be made " they would go to the assenting creditors; but this could not harm the non assenting, for it would leave so much more to be paid to them. If " losses be sustained," it would diminish the value of the equity of redemption. This is true, but it should be considered in two aspects. If the grantors were insolvent and the property insufficient to pay the mortgage notes, the equity of redemption would be valueless, and no loss would occur to non assenting creditors from its diminution. If the grantors were not insolvent or the property was more than enough to pay the mortgage notes, the non assenting creditors would have an interest in the equity of redemption, and the question would then be whether it would be better for their interests to use the property or to let it stand idle. Inasmuch as in the execution of this power by the trustee there could be no resulting gain to the grantors, we do not think it necessarily and conclusively follows that the deed is thereby fraudulent. The rest of the opinion is devoted to the assignment of April 6, 1874, which is not before us in this case.

In *Stafford National Bank* v. *Sprague*, 17 Fed. Reporter, 784, Shipman, J., follows the decision of the state court as to the sufficiency of the description under the law of the State, and then taking the mortgage and the assignment together he declared them fraudulent. He nowhere says that the mortgage by itself is fraudulent; he simply says it is void in Connecticut for want of particular description of the property. His strictures evidently refer to the assignment rather than the mortgage, for he refers to its terms, and quotes the language of the court in *De Wolf* v. *Sprague Manufacturing Co.*, which applied solely to the assignment.

For the reasons we have given we conclude that the mortgage was not executed to hinder, delay, or defraud creditors, and this is the point of the inquiry. As stated in Bump on Fraudulent Conveyances, 3d ed. p. 359, " The only fraud which will vitiate an assignment is fraud in its concoction. If there is no fraud in its inception, the property vests immediately in the assignee for the benefit of the creditors, and no subsequent fraudulent dealings can

revest the property in the debtor, or have a retroactive effect so as to avoid the assignment itself."

It follows from this conclusion that the title to the stock in question was in the trustee at the time of the levy, and therefore the complainant took nothing under the sale. This being decisive of the case, we do not consider the other questions raised and argued. The bill is dismissed.

*Decree entered April* 19, 1884, *dismissing bill without costs.*

*Arnold Green & William B. Beach,* for complainant.

*Andrew B. Patton,* for respondent A. & W. Sprague Manufacturing Company.

*Charles P. Robinson,* for respondent Phenix Iron Foundry.

*Charles Hart, James Tillinghast & C. Frank Parkhurst,* for respondent Chafee.

NOTE.— The foregoing case was heard by STINESS and TILLINGHAST, JJ.